# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                          No. CR 14-0606 JB

MICHAEL MATAYA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Sentencing Memorandum, May 7, 2015 (Doc. 66)("U.S. Memo.").[1]  The Court held a sentencing hearing on May 27, 2015. The primary issues are: (i) whether the Court should impose an aggravating role adjustment under U.S.S.G. § 3B1.1 for being an organizer, leader, manager, or supervisor of a criminal activity; and (ii) whether the Court should upwardly depart from Defendant Michael Mataya's United States Sentencing Guidelines range for exercising management responsibility over the property, assets, or activities of a criminal organization.  The Court will not impose an aggravating role adjustment, because M. Mataya's employees were not criminally responsible participants in M. Mataya's bankruptcy fraud scheme.  The Court will also not upwardly depart

---

[1]Defendant Michael Mataya's Sentencing Memorandum, filed May 24, 2015 (Doc. 70)("Mataya Memo."), did not contain any objections to the Presentence Investigation Report, disclosed April 6, 2015 ("PSR"), that the United States Probation Office ("USPO") prepared. After Plaintiff United States of America raised the issue in the U.S. Memo., however, M. Mataya explained at the sentencing hearing that he "concur[red] with the United States[']" objection. Transcript of Hearing at 5:1-10 (taken May 27, 2015)(Bowles)(the Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final version may contain slightly different page and/or line numbers).  The United States also clarified at the sentencing hearing that it did not raise the issue "as an objection," because it "felt that it was the defendant's . . . role to do so," but noted that it believed that the PSR had incorrectly applied § 3B1.1.  Tr. at 3:21-4:1 (Messec).  Accordingly, the Court will construe the United States' "issue" with the PSR's application of § 3B1.1 as an objection with which M. Mataya concurs.

from M. Mataya's Guidelines range, because his case does not lie outside the heartland of bankruptcy fraud cases.  Accordingly, the Court will sustain the parties' objection to paragraph 23 of the Presentence Investigation Report, disclosed April 6, 2015 ("PSR"), that the United States Probation Office ("USPO") prepared, and will not upwardly depart from M. Mataya's Guidelines range.

## FACTUAL BACKGROUND

On April 14, 2009, Indian Capitol Distributing, Inc. filed for bankruptcy under Title 11 of the United States Bankruptcy Code ("Chapter 11").[2]  See PSR ¶ 11, at 4.  M. Mataya entirely owned Indian Distributing and also served as its president.  See PSR ¶ 11, at 4.  Indian Distributing described itself as an oil sales and distributing business, consisting of a bulk sales operation and a number of retail gas stations and convenience stores.  See PSR ¶ 11, at 4.  M. Mataya also owned and operated a truck stop called Mataya's Travel Plaza, which sold petroleum products that it purchased from Indian Distributing.  See PSR ¶ 11, at 4.

On the same day that it filed for Chapter 11 bankruptcy, Indian Distributing also filed an emergency motion for permission to use its cash collateral.[3]  See PSR ¶ 12, at 4.  On April 16, 2009, with the approval of the Bank of Albuquerque, which held the interest in the cash collateral, the Bankruptcy Court entered an order allowing for the use of cash collateral during an

---

[2]Chapter 11 "permits reorganization under the bankruptcy laws of the United States" and "is available to every business, whether organized as a corporation, partnership or sole proprietorship, and to individuals."  Chapter 11, Title 11, United States Code, Wikipedia.org, https://en.wikipedia.org/wiki/Chapter_11,_Title_11,_United_States_Code (last visited Aug. 8, 2015).

[3]"When a creditor has an interest in a company's proceeds (such as a bondholder), the cash generated when these proceeds are sold is considered cash collateral and therefore can't be used by the debtor without the creditor's consent or by court order."  Cash Collateral, Investopedia.com, http://www.investopedia.com/terms/c/cash-collateral.asp#ixzz3hmv1tH1e (last visited Aug. 3, 2015).

emergency interim period.  See PSR ¶ 12, at 4.  One of the conditions placed on the use of cash collateral was that Indian Capitol Distributing was not permitted to "transfer other than for cash on delivery at the normal price for such product any inventory of a total cost of over $5,000 to an insider of the debtor or a relative of or entity owned in whole or in part by Michael Mataya." PSR ¶ 12, at 4 (internal quotation marks omitted).

During the interim period, the Bank of Albuquerque inspected Indian Distributing's records and determined that the bank's interest in Indian Distributing's cash collateral was not sufficiently protected.  See PSR ¶ 13, at 4.  The Bank of Albuquerque therefore withdrew its consent to Indian Distributing's use of the cash collateral.  Consequently, Indian Distributing filed a second emergency motion for permission to use the cash collateral.  See PSR ¶ 13, at 4. The Bankruptcy Court held an emergency hearing on the issue on May 1, 2009, at which time the Bank of Albuquerque objected to Indian Distributing's use of the cash collateral.  See PSR ¶ 13, at 4.  The court orally authorized Indian Distributing's use of the cash collateral until May 5, 2009. See PSR ¶ 13, at 4.

The Bankruptcy Court held a hearing on the original emergency motion on May 5, 2009. At the hearing, M. Mataya testified that Indian Distributing had picked up "two really large accounts" in the last week, one of which was Capitol Excavating.  PSR ¶ 14, at 4.  M. Mataya further testified that Indian Distributing bought the fuel that it sold to Capitol Excavating from the Navajo Nation Oil and Gas Company ("NNOGC"), and that Indian Distributing would make about $14,000.00 from selling it to Capitol Excavating after paying NNOGC.  PSR ¶ 14, at 4. M. Mataya also introduced a document showing the accounts receivable for Indian Distributing, which was dated April 30, 2009.  See PSR ¶ 14, at 4.  The document showed $189,605.42 due from Capitol Excavating.  See PSR ¶ 14, at 4.

At a hearing on May 18, 2009, M. Mataya testified that Capitol Excavating was a new account for Indian Distributing, but that it "had previously purchased product" at Mataya's Travel Plaza on a regular basis.  PSR ¶ 14, at 4.  Mataya stated that, because of the bankruptcy proceedings, he told Capitol Excavating that it would have to purchase from Indian Distributing rather than Mataya's Travel Plaza.  See PSR ¶ 14, at 4.  M. Mataya testified that it was not unusual for Capitol Excavating to go through 8,500 gallons of fuel a day.  See PSR ¶ 14, at 4. M. Mataya testified that the fuel bought from NNOGC would be deposited at Mataya's Travel Plaza, where trucks from Capitol Excavating would then then get fuel.  See PSR ¶ 14, at 5. Mataya also testified that one of his companies had delivered fuel to Capitol Excavating in Cortez, Colorado, within the last thirty days.  See PSR ¶ 15, at 5.  M. Mataya testified that Capitol Excavating had been a substantial account in the past for Mataya's Travel Plaza, with purchases of $300,000.00 or $400,000.00 at a time.  See PSR ¶ 15, at 5.

At the May 18, 2009, hearing, Indian Capitol Distributing introduced two documents related to a number of deliveries of fuel to Capitol Excavating -- Exhibits I-16 and I-17.  PSR ¶ 16, at 5.  Exhibit I-16 contained a bill of lading[4] that identified NNOGC as the fuel wholesaler and Indian Capitol Distributing as a secondary wholesaler.  See PSR ¶ 16, at 5.  Underneath Indian Capitol Distributing's name on that document were the letters "CE" handwritten over what appeared to be white out.  PSR ¶ 16, at 5 (internal quotation marks omitted).  What was underneath the white out could not be discerned from the copy of the document that Indian Distributing introduced at the hearing.  See PSR ¶ 16, at 5.

---

[4]A bill of lading "is a document issued by a carrier which details a shipment of merchandise and gives title of that shipment to a specified party."  Bill of Lading, Wikipedia.org, https://en.wikipedia.org/wiki/Bill_of_lading (last visited Aug. 3, 2015).

After M. Mataya testified at the hearing, the Bank of Albuquerque called its own witness to the stand.  See PSR ¶ 17, at 5.  The witness testified that he had conducted an on-site review of Indian Capitol Distributing's records, had received little cooperation from M. Mataya, and had to ask multiple times for documentation.  See PSR ¶ 17, at 5.  During his review of Indian Distributing's records, however, he located three bills of lading on which "CE" was written over a whited-out area.  PSR ¶ 17, at 5 (internal quotation marks omitted).  The witness determined that, underneath the white out, were the words "Mataya's Travel Plaza" or "MTP."  PSR ¶ 17, at 5 (internal quotation marks omitted).  The document that the witness presented was a copy of the original of Exhibit I-16; Indian Distributing's exhibit "had been whited out even further before presentation to the court to obscure the words 'Mataya's Travel Plaza.'"  PSR ¶ 17, at 5 (internal quotation marks omitted).  The Bank of Albuquerque presented the second and third bills of lading with "CE" written over a whited-out area.  PSR ¶ 17, at 5 (internal quotation marks omitted).

M. Mataya's explanation for the white outs was that they were to avoid confusion whether Capitol Excavating or Mataya's Travel Plaza was supposed to be billed for the fuel.  See PSR ¶ 17, at 5.  The witness further testified that his review of Indian Distributing's records showed no payment from Capitol Excavating to Indian Distributing.  See PSR ¶ 17, at 5.  The witness did find, however, a $91,000.00 credit issued to Mataya's Travel Plaza and a corresponding $91,000.00 invoice issued on the same day to Capitol Excavating.  See PSR ¶ 17, at 5.  The witness testified that these circumstances suggested that Indian Distributing had "substituted invoices."  PSR ¶ 17, at 5.

The Bank of Albuquerque's witness also testified that he conducted an investigation into Capitol Excavating.  See PSR ¶ 18, at 5.  He said that he could not find any business listings for

- 5 -

either "Capitol Excavating" or "Capital Excavating" in Colorado -- where the address that M. Mataya provided for Capitol Excavating was located.  PSR ¶ 18, at 5.  He further testified that he could not find any listings for either spelling in the official state corporate records for New Mexico or Colorado.  See PSR ¶ 18, at 5.  The witness said that he drove to Cortez, Colorado -- the city where Capitol Excavating was purportedly located -- and visited the postmaster there. See PSR ¶ 18, at 5.  According to the witness, the postmaster said that no mail had arrived for Capitol Excavating or that anyone from Capitol Excavating had picked up, and that, as far as he knew, there was no Capitol Excavating in Cortez.  See PSR ¶ 18, at 5.  The witness also introduced an exhibit listing all the business required to pay sales tax in Cortez; Capitol Excavating was not listed.  See PSR ¶ 18, at 5.  Finally, the witness presented an Indian Distributing's accounts receivable report, which listed a telephone number for Capitol Excavating.  See PSR ¶ 18, at 5.  The witness testified that, when he called the telephone number, he reached an adult chat line.  See PSR ¶ 18, at 5.  Accordingly, the witness concluded that Capitol Excavating did not exist, but instead functioned as a surrogate for Mataya's Travel Plaza.  See PSR ¶ 18, at 5.  After the Bank of Albuquerque's witness testified, M. Mataya took the stand in rebuttal and maintained his previous testimony about Capitol Excavating.  See PSR ¶ 18, at 5-6.  M. Mataya said that he dealt with a man at Capital Excavating named Don Connolly.  See PSR ¶ 18, at 6.  On June 11, 2009, on the Bank of Albuquerque's motion, the Bankruptcy Court ordered the appointment of a Chapter 11 Trustee for Indian Distributing, finding that "after the commencement of the case there ha[d] been incompetence and gross mismanagement of the affairs of the debtor by management."  PSR ¶ 19, at 6 (internal quotation marks omitted).

Over three years later, in November, 2012, a forensic accountant and special agent with the Federal Bureau of Investigation interviewed Joyce Rivera, who served as Indian Distributing's bookkeeper from 1978 to 2009.  See PSR ¶ 20, at 6.  Rivera "had limited knowledge about Capitol Excavating," but remembered one instance in which M. Mataya gave her a box and told her to take it home.  PSR ¶ 20, at 6.  Rivera did not find this situation unusual, because sometimes M. Mataya would give her used office equipment or other items to take home.  See PSR ¶ 20, at 6.  When Rivera opened the box at home, she found that it contained several bills of lading from Capitol Excavating.  See PSR ¶ 20, at 6.  She brought the documents back to Indian Distributing the following day, and placed them in a vault between her office and Mataya's.  See PSR ¶ 20, at 6.  Another witness later told the forensic accountant that, after he saw and copied the bills of lading, he returned to Indian Distributing to look for the documents, but they had disappeared.  See PSR ¶ 20, at 6.

 Rivera thought that the situation with Capitol Excavating was odd, so she asked Charles Mataya -- M. Mataya's cousin, who worked for Indian Distributing for over thirty years as a truck dispatcher, wholesale inventory manager, and processor of bills of lading -- what he knew about the company.  See PSR ¶¶ 21-22, at 6.  C. Mataya said that M. Mataya had instructed him only to set up a new account for Capitol Excavating, and that M. Mataya had provided him the company's address and telephone number.  See PSR ¶ 21, at 6.  Rivera also recalled multiple instances in which she mailed invoices to Capitol Excavating and that they came back "return to sender."  PSR ¶ 21, at 6.

The forensic accountant also interviewed C. Mataya.  See PSR ¶ 22, at 6.  C. Mataya stated that, based on his experience as a truck dispatcher for Indian Distributing, he suspected that Capitol Excavating was not a legitimate company.  See PSR ¶ 22, at 6.  C. Mataya said that

M. Mataya gave instructions to deliver the fuel to Mataya's Travel Plaza, but to bill Capitol Excavating.  See PSR ¶ 22, at 6.  C. Mataya said "this was why the original bills of lading that showed delivery to Mataya's Travel Plaza were whited out and replaced with Capitol Excavating."  PSR ¶ 22, at 6.  C. Mataya also said that the substituting of invoices was related to M. Mataya's instructions to record fuel that was delivered to Mataya's Travel Plaza as being delivered to Capitol Excavating.  See PSR ¶ 22, at 6.

## PROCEDURAL BACKGROUND

The Indictment, filed February 26, 2014 (Doc. 4)("Indictment"), charged M. Mataya with: (i) knowingly and fraudulently making a false statement under oath and in relation to a Title 11 bankruptcy case on May 5, 2009, in violation of 18 U.S.C. § 152(2)("Count 1"); (ii) knowingly and fraudulently making a false material statement under oath and in relation to a Title 11 bankruptcy case on May 18, 2009, in violation of 18 U.S.C. § 152(2)("Count 2"); and (iii) knowingly and fraudulently transferring property belonging to the estate of the debtor to another between April 29, 2009, and May 18, 2009, in violation of 18 U.S.C. § 152(7)("Count 3").  See Indictment at 1-2.  On January 16, 2015, M. Mataya pled guilty to Count 3 of the Indictment.  See Plea Agreement at 1-2, filed January 16, 2015 (Doc. 57).

### 1.      The PSR's Guidelines Calculation for Mataya.

The USPO disclosed the PSR on April 16, 2015.  Relying on § 2B1.1, the PSR calculates a base offense level of 6 for M. Mataya.  See PSR ¶ 29, at 6.  The PSR applies a 12-level increase in M. Mataya's base offense level under § 2B1.1(b)(1)(G), because the loss amount of his offense exceeded $200,000.00.  See PSR ¶ 30, at 8.  The PSR also applies a 2-level increase under § 2B1.1(b)(9)(B), because his offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding.  See PSR ¶ 31, at 8.  The PSR then

provides a 2-level increase under § 3B1.1(c), because M. Mataya was an organizer, leader, manager, or supervisor of criminal activity.  See PSR ¶ 33, at 8.  The PSR then recommends a 3-level decrease for M. Mataya's timely acceptance of responsibility.  See PSR ¶¶ 37-38, at 8.  The PSR thus calculates M. Mataya's total offense level to be 19.  See PSR ¶ 39, at 8.  The PSR also calculates a criminal history score of 0, because M. Mataya has no prior criminal convictions.  See PSR ¶ 43, at 9.  M. Mataya's total offense level of 17 and criminal-history category of I results in a Guideline imprisonment range of 30 to 37 months.  See PSR ¶ 85, at 17.

### 2.    The U.S. Memo.

The United States filed the U.S. Memo. on May 7, 2015.  The United States argues that the Court should not impose a 2-level aggravating role adjustment under § 3B1.1, because the two employees that Mataya directed -- Rivera and C. Mataya -- are not "criminally responsible participants in the offense under the meaning of § 3B1.1, application note 1."  U.S. Memo. at 1 (internal quotation marks omitted).

### 3.    The Sentencing Hearing.

The Court held a sentencing hearing on May 27, 2015.  The United States kept its argument on the aggravating role adjustment brief:

> [A] role enhancement like this only applies i[f the] defendant is directing others in the offense and those other individuals have to always be criminally responsible participants.  I don't believe there are any criminally . . . responsible participants in the offense[.]  [T]he people who were being directed are in fact that victims of the offense.  So I don't think that this role adjustment actually applies.  So I think that the correctly calculated guideline range . . . is 24 to 30 months.

Tr. at 4:1-11 (Messec).  M. Mataya similarly focused on the fact that Mataya's employees did not participate in his criminal activity in arguing that § 3B1.1 should not apply:

> I concur with the United States.  I should have included this as an objection when I read it.  It just seemed to me to be very persuasive and that may be the reason I did not put that in my, but I do want to con[cur] with the United States.  I think

Ms. Messec is correct regarding the application of that role enhancement.  I do not think they were participants at all in any criminal activity, those other individuals.

Tr. at 5:1-10 (Bowles).[5]

## LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, thus making the Guidelines sentencing ranges effectively advisory. <u>See</u> 543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> **(A)**    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)**    to afford adequate deterrence to criminal conduct;
>
> **(C)**    to protect the public from further crimes of the defendant; and
>
> **(D)**    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section

---

[5]The USPO did not respond to the parties' objection to ¶ 23 of the PSR.

3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines ranges are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 525 U.S. 38 (2007), as recognized in United States v. White, 265 F. App'x 719, 728 n.8 (10th Cir. 2008)(unpublished).  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[6] Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

---

[6]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory. Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will

- 12 -

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.   Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.   The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).   The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."   Kimbrough v. United States, 552 U.S. at 89.   Applying § 3553(a)'s factors, the Court has

---

> subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).
>
> . . . .
>
> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).   In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.   In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."   Irizarry v. United States, 553 U.S. 708, 710-16 (2008).   A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.  See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010) (Browning, J.).  On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute."  530 U.S. at 481.  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  542 U.S. at 303 (emphasis omitted)(citations

omitted)(internal quotation marks omitted).  In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement."  (alterations omitted)(internal quotations marks omitted)).  The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement-findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See United States v. Magallanez, 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress'

passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."   United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence out to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."   United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[7]  "[T]he application of an enhancement . . . does not

---

[7]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516

implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may only assert an error under Apprendi v. New Jersey where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[8](holding that, after Alleyne v. United

_____

(finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

[8]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that United States v. Hendrickson; United States v. Powers, 578 F. App'x 763 (10th Cir. 2014)(unpublished); United States v. Schmidt, 353 F. App'x 132 (10th Cir. 2009)(unpublished); United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(unpublished); United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished); United States v. Duncan, 99 F. App'x 196 (10th Cir. 2004)(unpublished); United States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762 (10th Cir. Jan. 12, 1999)(table opinion)(unpublished); and United State v. Webster, No. 94-3186, 68 F.3d 484 (10th Cir. Oct. 20, 1995)(table opinion)(unpublished), have persuasive value with

States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").  As the Court has noted:

> The Court explained that, although the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u>, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from <u>Apprendi v. New Jersey</u>, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. <u>See</u> [<u>United States v. Sangiovanni</u>, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26[ (D.N.M. Aug. 29, 2014)(Browning, J.)].

<u>United States v. Cervantes-Chavez</u>, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov. 3, 2014)(Browning, J.).

## **LAW REGARDING RELEVANT CONDUCT FOR SENTENCING**

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt. n.1(H).  In <u>United States v. Booker</u>, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the <u>real conduct</u> that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in <u>United States v. Booker</u> suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the guidelines.

---

respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Section 1B1.3 provides that the base offense level under the guidelines "shall be determined" based on the following:

(1)  (A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)  solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)  all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)  any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which

the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's 1991 attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the

prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution provides.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and that "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's

use of conduct for which the defendant had been acquitted.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the

constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case

law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence. See 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life. See 11 F.3d at 1515. The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)). See United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the Guidelines that corresponds to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 2014 WL 6065657, at *14-15 (cross referencing from the guideline for being an illegal alien in possession

of a firearm to the drug-possession Guidelines after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

## LAW REGARDING U.S.S.G. § 3B1.1 AGGRAVATING ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense. Section 3B1.1 of the Sentencing Guidelines provides:

Based on the defendant's role in the offense, increase the offense level as follows:

> **(a)**    If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> **(b)**    If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> **(c)**    If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1.  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1, cmt. n.1.

Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, cmt. n.4.   The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this

enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'" United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).  See United States v. Vigil, 998 F. Supp. 2d 1121, 1155 (D.N.M. 2014)(Browning, J.)(refusing to find that nurse practitioner, who was illegally distributing controlled substances, was a leader or organizer even though she was essential to the success of the drug trafficking scheme).  "'A defendant's participation in illegal but lower-level activities,' however, 'will not support application of the enhancement.'"  United States v. Vigil, 998 F. Supp. 2d at 1144-45 (quoting United States v. Sallis, 533 F.3d at 1223).  Nevertheless, "[a] defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant."  United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012).

> The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has also
>
> identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy;" "he restricted the people to whom other coconspirators could sell their drugs;" and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds."  United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223.  "[A] 'role as a supplier of drugs to others, standing alone, is not enough' to justify a leader enhancement" under § 3B1.1, nor is "supplying drugs on credit, or fronting, without more."  United States v. Sallis, 533 F.3d at 1223-24 (quoting United States v. Anderson, 189 F.3d at 1212)(citing United States v. Owens, 70 F.3d 1118, 1129 (10th Cir. 1995)).

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five

participants and that is not otherwise extensive].'"  United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009)(alterations in original)(quoting U.S.S.G. § 3B1.1(c)).  See United States v. Tilga, 824 F. Supp. 2d 1295, 1319 n.12 (D.N.M. 2011)(Browning, J.)("Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons.  The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization.").  "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1, cmt. n.3.  "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."  U.S.S.G. § 3B1.1, Background.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct.  "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction.  To qualify as an organizer, however, no control is necessary."  United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)).  The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants."  United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997).  Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'"

United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (10th Cir. 1995)).

**ANALYSIS**

The Court will not apply a § 3B1.1 enhancement or upwardly depart from M. Mataya's Guidelines range.  Section 3B1.1 provides for a 2-level enhancement if the defendant is "an organizer, leader, manager, or supervisor in any criminal activity."   U.S.S.G.  §  3B1.1. Application Note 2 to § 3B1.1 states: "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. § 3B1.1, cmt. n.2.  The Tenth Circuit has explained that, "[a]lthough not apparent from the language of the Guideline, any enhancement under § 3B1.1 . . . requires the involvement of at least one 'participant' other than the defendant."  United States v. Gallant, 537 F.3d 1202, 1241 (10th Cir. 2008).  See United States v. Cruz Camacho, 137 F.3d 1220, 1224 (10th Cir. 1998)(holding that, in order to receive an enhancement under § 3B1.1, defendant must have "exercised control consistent with his leadership role over at least one other participant"). Application Note 1 defines a participant as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1, cmt. n.1.  In United States v. Aptt, 354 F.3d 1269 (10th Cir. 2004), the Tenth Circuit noted that employees "who are unaware of the operation's fraudulent nature are not criminally responsible participants; as a result, managing or supervising their activities does not qualify a defendant for [a § 3B1.1] enhancement."  354 F.3d at 1285.

In United States v. Galant, 537 F.3d 1202 (10th Cir. 2008), the defendant used companies that he owned and operated, and those companies' employees, to perpetrate a bank-fraud scheme.  See 537 F.3d at 1211.  Reasoning that the defendant's employees "were required to

accomplish the deception," the district court applied a § 3B1.1 adjustment.  537 F.3d at 1241.

On appeal, the Tenth Circuit reversed, concluding that the sentencing judge erred in applying

§ 3B1.1 absent evidence that any of the defendant's employees were criminally responsible

participants in the bank-fraud scheme.  See 537 F.3d at 1242.  The Tenth Circuit said that,

without more, the defendant's "organizational control" over his employees did not trigger a

§ 3B1.1 enhancement.  537 F.3d at 1242.

The United States Court of Appeals for the D.C. Circuit reached a similar conclusion in

United States v. Bisong, 645 F.3d 384 (D.C. Cir. 2011).  That case involved a defendant, John

Bisong, who perpetrated immigration fraud and check fraud schemes for three years.  See 645

F.3d at 397.  The D.C. Circuit held that the district court abused its discretion by applying a

§ 3B1.1 aggravating role adjustment.  The D.C. Circuit explained that a participant under

§ 3B1.1 must "commit all of the elements of a statutory crime with the requisite mens rea."  645

F.3d at 397.  The D.C. Circuit said that a defendant's "supervision of an unwitting individual

cannot justify an enhancement," and that the enhancement applies "only where a participant, at a

minimum, is criminally responsible as an accessory."  645 F.3d at 397.  The D.C. Circuit

concluded that, because there was no indication that any of Bisong's employees were aware of

his check fraud or assisted it, the district court abused its discretion in applying a § 3B1.1

adjustment.  See 645 F.3d at 398.

Like the defendants in United States v. Galant and United States v. Bisong, M. Mataya

supervised "unwitting individual[s]" to the conspiracy.  United States v. Bisong, 645 F.3d at 397.

Although C. Mataya told the FBI's forensic accountant in November, 2012, that he believed

Capitol Excavating was a fictitious company, there is no evidence that C. Mataya knew this

information when M. Mataya fraudulently transferred property and made his fraudulent

statements from April 20, 2009, to May 18, 2009.  In fact, the United States represented at the

sentencing hearing that both C. Mataya and Rivera were "victims of the offense," Tr. at 4:8

(Messec), rather than "criminally responsible participants,"  United States v. Aptt, 354 F.3d at

1285.  Because the United States has not shown by a preponderance of the evidence that C.

Mataya and Rivera were aware of or knowingly participated in M. Mataya's criminal activities --

and the United States has, in fact, represented that they were victims of M. Mataya's offense --

the Court will not apply an aggravating role enhancement under § 3B1.1.

    That conclusion does not end the Court's inquiry, however.  Application Note 2 also

provides for an upward departure when a defendant "did not organize, lead, manage, or supervise

another participant, but . . . nevertheless exercised management responsibility over the property,

assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, cmt. n.2.[9]  The Court recently

noted that this sentence "sets forth conditions for a departure -- not an adjustment, like the rest of

§ 3B1.1 -- and, thus, to apply, the defendant's level of managerial authority must be outside the

heartland of cases that the substantive guideline contemplates."  United States v. Courtney, No.

CR 11-2860 JB, 2014 WL 7472975, at *18 (D.N.M. Dec. 15, 2014)(Browning, J.).  In United

States v. Cervantes-Chavez, the Court considered whether to depart on managerial-authority

grounds where a defendant was discovered hiding 175 pounds of marijuana and $19,625.00 in

cash at his house -- almost certainly a drug organization's "property [and] assets."  United States

v. Cervantes-Chavez, 2014 WL 6065657, at *2.  The Court declined to apply an aggravating role

enhancement, because -- although the defendant appeared to be a middleman in the drug trade

based on the amount of drugs he was holding -- the United States could not point to any

individual over whom the defendant had leadership or managerial control; the defendant was the

---

[9]Neither the United States nor the USPO requested an upward departure, but the Court,
for the sake of thoroughness, chose to examine the issue.

only member of the drug organization that the United States could find.  See 2014 WL 6065657, at *22.

The Court also declined to depart on the managerial-responsibility grounds outlined in the second sentence of Application Note 2 to § 3B1.1, concluding that, although the defendant exercised some managerial responsibility over a drug organization's assets, the defendant had already been sentenced under the guideline for possessing 80-100 kilograms of marijuana with intent to sell it, and the defendant's level of managerial responsibility did not fall outside the heartland of cases that the substantive-offense guideline contemplated.  See 2014 WL 6065657, at *28.  The Court found that most offenders guilty of possessing that quantity of marijuana have some level of managerial responsibility over a drug organization's assets -- it is unlikely that an individual unaffiliated with a drug organization would come into possession of that much marijuana -- and thus the case was not "outside the heartland of cases that § 2D1.1(c)(8) [the guidelines for possessing 80-100 kilograms of marijuana] contemplates."  2014 WL 6065657, at *28.

The Court will exercise its discretion to not depart upward.  While the Guidelines provide for an upward departure, the facts and circumstances of this case do not warrant one. Unfortunately, where there is fraud, there are victims and -- in most federal cases -- large financial losses.  At the same time, victims and large losses do not take the case outside of the heartland of other cases.  This case remains in the heartland of fraud cases that the Court has seen, that other federal judges in this District see, and that federal judges across the country see. Although M. Mataya's fraudulent schemes have led to considerable losses for his victims, the number of M. Mataya's victims and the amount of loss that those victims suffered do not lie outside the heartland of bankruptcy fraud cases, fraud cases, or federal cases in general.

Accordingly, the Court will not depart upward based on M. Mataya's exercise of "management responsibility over the property, assets, or activities of a criminal organization."   U.S.S.G. § 3B1.1, cmt. n.2.

      **IT IS ORDERED** that the objection in the Plaintiff's Sentencing Memorandum, May 7, 2015 (Doc. 66), is sustained, and the Court will not upwardly depart from Defendant Michael Mataya's sentencing range under the United States Sentencing Guidelines.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
  United States Attorney
Paige Messec
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

--and--

William F. Davis
Nephi D. Hardman
William F. Davis & Associates, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendant*